MORRIS and SMYSER, administrators of EICHELBERGER, against JAMESON.

IN ERROR.

By an agreement under seal two brothers, T. and W., exchange possession of farms which it is supposed their father intends to give them respectively by his will, T. throwing in a part of his own land, (fifty acres.) The father made his will, leaving to each immediately, or through the intervention of trustees, the farm he had intended for the other, and desired T. to make assurance of the fifty acres pursuant to the agreement. W. died living the father, who by codicil, directs his executors to sell the fifty acres, and with the proceeds pay certain notes of W., on which he was indorser, as also a debt due from W. to T., and apply the residue to trusts in favor of W.'s children. T., after the death of the father, conveys the fifty acres to the trustees of W.'s children. The administrators of W., under an order of the Orphans' Court, sold the fifty acres; in a suit brought by one of the creditors of W. against his administrators, it was held, that W. had no estate in the fifty acres which could be subjected to the satisfaction of his debts.

Error to the District Court of York, in which judgment had been rendered in favor of the plaintiff, the defendant in error, on the following case stated, in the nature of a special verdict.

---

* The following opinions of the court in the above case, delivered in 1813, when the Supreme Court reversed the judgment of the Court of Common Pleas of *Berks* county, upon a verdict in favor of the defendants, have been obtained by the reporters, and as they have never been published, and the points involved are of much interest, they are inserted here.

Tilghman, C. J.—The plaintiff claimed under a warrant to *Jacob Miller,* dated the 1st of October, 1784, for 400 acres of land, a survey for *Michael Gunkle,* of 421 acres and 116 perches, October 19th, 1784, and a patent to *John Shaeffer,* dated the 10th of January, 1786, on which there is a recital of the conveyance, transferring the title, from the warrantee down to the said *Shaeffer.* But those conveyances were not produced.

The defendant made title under an application, in the name of *Eronamus Henning,* dated the 7th of April, 1769, for 300 acres of land "over the Blue Hills, joining *Robert Delap,* on the westernmost branch of Big Schuylkill, *Berks* county." There was no evidence of any order of survey on this application, until after the year 1783, the precise time of issuing this order, was not ascertained; but a survey was made by *William Wheeler,* deputy surveyor, on the 13th of October, 1788. It was returned by *Wheeler* as a *re-survey,* and contains 374 acres 31 perches. Parol evidence was given of the lines of an ancient survey, which must have been made at

51

(Eichelberger's admrs. *v.* Jameson.)

On the 24th of March, 1821, *Frederick Eichelberger* was seiz-
ed in fee of two farms in *York* county, one in the possession of his
son *Thomas Eichelberger*, the other in possession of his son *Wil-*

a time, not far distant from the date of the application. No application, warrant or
survey, in the name of *Robert Delap*, was to be found in the office of the secretary,
or surveyor general—but a paper was offered in evidence, containing a draught of
several adjoining surveys, one of which was in *Delap's* name; this draught appeared
to be the work of *William Scull*, formerly a deputy surveyor in *Berks* county; and
there was evidence which rendered it probable, that it had been among the office
papers of the deputy surveyor of that district. The court permitted it to be given
in evidence, although objected to by the counsel for the plaintiff, and a bill of ex-
ceptions was taken to their opinion. As evidence of *title*, I do not think this paper
was admissible, but as a circumstance throwing light on the description in *Henning's*
application, it was. It is possible that no official survey was ever made for *Delap*,
but that there had been an authorized survey of land intended to be taken up: this
is putting the matter as strongly against the defendant as the case deserves. Yet
still, it might serve to designate the spot on which *Henning* intended to make his sur-
vey, and if it had been made and returned, there is no doubt but the officers of the
proprietaries would have accepted it, the whole truth being disclosed to them; al-
though *Delap* had never applied for the land, which he had intended to take up.
There was no error, therefore, in permitting it to be given in evidence.

There are three errors assigned in the Judge's charge to the jury.

1st. In his saying that the evidence of *John Dreher*, was very important.

2nd. In his not charging that the order of survey issued after the year 1783, on
the application of *Henning*, was *conclusive* evidence that no survey had been made
before.

3d. In his mistaking the nature of *Henning's* application, which was so loose and
uncertain, that under all the circumstances of the case, the title did not attach till
the return of survey.

1. A material inquiry in this cause was, at what time there had been an official
survey on *Henning's* application. When *Wheeler* made the survey in 1788, marks
of an ancient survey were found. The evidence of *Dreher* went to show those
marks, and all that the judge said was, that "the testimony of *Dreher* was very im-
portant to that point." That it was important to that point is evident, and it is also evi-
dent that it was a point proper to be inquired into. This leads to the consideration
of the

2nd Error assigned in the charge: Was the order of survey, after the year 1783,
conclusive evidence that no former order had been issued?

In my opinion, it was strong evidence, but not conclusive. There might have been
a former order issued, the evidence of which had not been preserved in the land of-
fice. The papers of that office have been subject to unsafe keeping, and frequent
removals. The acts of the officers are not to be found in books where every trans-
action was regularly recorded; but the evidence of those acts often rest on detached
papers, preserved in files or bundles, and of course subject to accident and loss. It
would be carrying the case (then) to a dangerous length, to say that because no or-
der of survey was to be found prior to the year 1783, therefore, it must be taken for
granted, that no such order had ever existed.

The 3d error assigned, turns on the nature of *Henning's* application. On this
point, the charge is to the following effect: "If the application be descriptive of the
land in question, and the survey made in fact, before the date of the warrant under
which the plaintiff claims, although not returned, the defendant would be entitled
to retain the land, so if it describes the land with sufficient certainty." It has been
objected that by this charge, the jury might have been led to believe, that if a sur-
vey had been in fact made *without authority* before the date of the warrant, the de-
fendant would be entitled to the verdict. But this is not treating the charge with
that candor and liberality, to which it is entitled. We must not exercise grammatical

(Eichelberger's admrs. *v.* Jameson.)

*liam Eichelberger.* *Thomas* at the same time was seized in fee of one-fourth of 180 acres of land in *Adams* county.   By articles of agreement entered into between *William* and *Thomas*, on the

criticism in order to destroy the substance of the opinion.   The whole charge is to be taken together, and its import fairly considered.   I have no doubt of its true meaning, a survey made by lawful authority was intended; and if the plaintiff's counsel had considered the expressions as doubtful, or equivocal, they ought to have brought the point immediately before the mind of the judge, at the time of the charge, by asking explicitly whether the defendant could support his defence under a survey made without authority.   Let us consider, then, the nature of the description in *Henning's* application.   "300 acres over the Blue Hills, joining *Robert Delap*, on the westernmost branch of Big Schuylkill." It is loose in the extreme in every part, except the joining of *Robert Delap:* no trace has been found of any right in *Robert Delap*, by warrant, application or survey, in the proprietary's office.   Still he might have been owner of a tract taken up by some other person; but I do not find that there was evidence of any person of that name, having owned, claimed or resided upon the land adjoining the defendant's survey, or any kind of evidence on the subject, except the old draft of *William Scull*, which has been before mentioned. Now suppose a man of the name of *Delap*, had caused lines to be run by the deputy surveyor without authority, with a view of entering an application, which he never did enter, that he relinquished his intention, and never had any thing to do with the land.   Under those circumstances, ought the location calling for *Delap's* tract, to be considered as such a description as would give title to the defendants immediately on the making of their survey, although that survey was not returned for nearly twenty years afterwards?   A thing is certain which may be rendered certain by reference to other things.   The reference here, was to *Delap's* tract.   But no such tract being to be found in the land office, how were the officers to know of it, and if no such person as *Delap*, lived on the land or claimed it, how were the public to know it? and if it were impossible to obtain a knowledge of the spot which *Henning* meant to appropriate; and the matter remained in this uncertainty for fifteen years, when *Jacob Miller* purchased it of the commonwealth, is it reasonable that he should lose it?   What is the use of a description, but to apprise other persons of the situation of the land described?   It appears to me that this point was not submitted to the jury, in such a manner as to make them understand the law.   They ought to have been told, that if the description was of such a nature as to afford no reasonable means of ascertaining the situation of the land, until the return of survey, in such case, the defendant's title must take date from the time that the survey was returned; because this survey was not returned in a reasonable time.   I think, too, that it would have been proper to inform the jury, that they were to judge whether the delay of a return of survey, was not occasioned by the neglect of *Henning*, or those who derived title under him, because it appears very doubtful on the evidence, whether any order of survey was taken on this application, before the year 1783, and if it had been, it might have happened as was frequently the case, that in order to avoid paying the fees and expenses of survey, he suffered the return to be postponed; such serious inconveniences arise from long protracted returns that it should always be inquired, by whose fault the delay was occasioned.   We know very well that no more than seven shillings being paid on the entry of an application in the year 1769, the applicant sometimes relinquished the land, and where such was the intention, he ought not to be permitted to revive his claim after the lapse of many years, when the land has become valuable, and another person has taken it up and paid for it.   In this part of the judge's charge, then, I think there was error.

But it has been urged, on the part of the defendant, that it appears on the record that the plaintiff showed no title, and therefore the cause ought not to be sent down for another trial.   The defect of the title alluded to, is in not producing the deeds of conveyance prior to the patent, which are recited in the patent.   These recitals, it is said, are no evidence against the defendants, but that is begging the question in dis-

(Eichelberger's adm'rs. *v.* Jameson.)

said 24th of March, *Thomas* exchanged his farm in *York* county, and the undivided one-fourth of the 180 acres of land in *Adams* county, with *William* for his farm in *York* county; the said

---

pute. The defendants claim under the commonwealth. The recitals are the confession of the commonwealth, therefore, they are evidence against the defendants, if their title commences after the date of the patent. If the title of the defendants, then, commence from the return of their survey, the recitals in the patent are evidence against them: so that we are brought back to the point whether, under the circumstances of this case, the title of the defendants takes date from the entry of their application or the return of their survey; my opinion on the whole, is, that the judgment be reversed and a *venire facias de nova* awarded.

Brackenridge, J.—The principle would seem to be correct, that on a verdict for the defendant, and a writ of error by the plaintiff, where it appears from the record, that no judgment could be rendered for the plaintiff, it will be to no purpose to reverse that for the defendants. Want of jurisdiction in the court, unlawful cause of action, set forth in the declaration; want of evidence to sustain it, appearing from the facts stated in the plaintiff's bill of exceptions, may effect this. The plaintiff in his bill of exceptions states an equity out of the commonwealth to a certain *Jacob Miller*, that is sufficient to defeat the patent of the plaintiff, unless he can show the equity of *Miller* to *be in him the plaintiff.* The plaintiff must recover by his own strength, and if *Miller's* right is not in him, *it must be against him.* But he shews the equity of *Miller* to be in him, by shewing it to be in a certain *Gunkle,* and *Gunkle's* right to be in him, the plaintiff. This he shews by recitals in the patent to himself. Can these recitals be evidence of the transfers so recited? Let us see how this stands? An equity in *Miller,* by warrant. This equity in *Michael Gunkle,* by a *survey* in right of *Jacob Miller;* a patent from the commonwealth to *John Shaeffer,* the plaintiff in right of *Michael Gunkle,* in right of *Jacob Miller.* Who has a right to question the right of *Miller* being in *Gunkle,* but *Miller* or some one claiming under *Miller?* And who has a right to question the right of *Gunkle* being in *Shaeffer,* but *Gunkle,* or some one claiming under *Gunkle?* It is not *Miller,* or any claiming under him, that questions the transfer to *Gunkle.* Nor is it *Gunkle,* or any claiming under *Gunkle,* that questions the conveyance to *Shaeffer.*

Shall it lie in the mouth of a third person, to say to *Shaeffer,* you have not the equity of *Miller* in you, when the commonwealth, granting the legal title, says: I have seen these conveyances, or other evidences of transfers, and I am satisfied that he has? But a *third* person might say: I have an equity under the proprietor, the former owner of the land or under the commonwealth, since and *before* the equity of *Miller,* to which your patent from the commonwealth refers. Shew that, and there is an end of it. But what have you to do with the chain of title from *Miller* to *Sheaffer,* when the commonwealth, with whom the legal title lay recognizes *Shaeffer* as entitled to the legal estate in right of *Miller?*

It is every day's practice in the land office, that a patent is granted to one, on the inception of a title, or original equity of another; and the courts of law do not inquire why so granted, but at the instance of one who has a right to inquire. And this must be one who claims under *the same equity.* The principle that one cannot derive title to himself, by the *recital* of a grant from him who had title, is correct. But it is the person *having title,* that grants here reciting the consideration of the grant to one on an equity to another. It is sufficient for the grantor to be satisfied, that the equity out of him to A is now in B, and in consideration of this, he makes the legal estate to B. In whose mouth does it lie, but in that of A, or one claiming under A, to contest this equity, and that the right to receive the legal estate is in B? B must first show to a court of law, an inception of title or equitable interest in A, but what stronger evidence can there be, or at least, what other evidence shall be demanded, but the acknowledgment of him in whom the legal estate is, that the

(Eichelberger's admrs. *v.* Jameson.)

two farms in *York* being those as above mentioned of their father *Frederick.* By the same articles of agreement titles for the exchange of the properties as aforesaid were to be executed on or before the

equitable interest in A, is now in B.   It is A, or those claiming under him, that can alone contest this.

So the commonwealth reciting an equity in *Miller,* would be no evidence of that equity against a third person, claiming an equity also under the commonwealth. But the equity in *Miller* must be shown to be out of the commonwealth, before the equity to him, the third person had attached, because the fact of the equity being out of the commonwealth to *Miller,* and the *date* of that becomes important.   But here the equity to *Miller* by warrant, and the date of that warrant has appeared. This is the doctrine the judge laid down, and I think it is correct.

We proceed, then, to consider the grounds of error, which have been assigned in the judgment for the defendant.   Was it error, to admit a paper purporting to be a draft of lines run, with the name of *Delap* upon it, the application of the defendant calling for *Delap,* as adjoining that, for which he made the application?   It is a paper that bears the marks of age upon the face of it.   I speak of the paper itself, distinct from the lines or writing upon it.   It has an air of antiquity in the texture, and no recent water-marks of modern impression are visible.   But the *ink of the lines impressed upon it,* is faded by exposure to the air, and length of time.   The writing upon it, is proved to be of those long since deceased.   Its decent is through the medium of an office.   It would seem to have once been in the hands of an officer for some purpose.   It is not just the same as if it had been found in *the trunk of an old inhabitant.*   Though even in that case, lines being found upon the ground, corresponding or nearly so, with the *date* of the application, which refers to it, could it be said that it did not contribute some evidence to show the place of the application?   It would seem to me, therefore, that it was admissible, so far as respected boundary.   This being so, the judge would not seem to have erred in considering the testimony of the witness tracing these lines to be of some importance.   I would not reverse for error in the *less* or *more* importance, which he attached to it.   The only question can be, was it evidence, and had some bearing on this case? as evidence of boundary or description, it would seem to be evidence.   An order of survey is not conclusive that it was not in fact a *re-survey;* but it is *presumptive* of it, and will stand until the contrary appears.   The judge, therefore, did not err *in refusing to charge the jury* that it was conclusive.

But it is said that no evidence is shown to rebut the *presumption,* that it was not a re-survey; for it could not be called a re-survey, unless an *official* survey had been originally made.   That it was an official survey we have no evidence, farther than that it was made *about the time of the application.*   It is very clear from the testimony, says the judge, "that a survey had been made of the land in dispute by *somebody,* about the time of the application."   It is not left to the jury to say whether this survey was an official act, made by an authorized agent or otherwise: they had no evidence that it was an official act, but that of being made about the time of the application.   The judge might have it in his mind, and mean to distinguish, and to leave it to them to say, whether they could infer from this circumstance that it was an official act?   But it is not clearly distinguished in his charge, what it was that was left to them; and the material point in this case was, whether the survey was an *official act or not.*   For if not official, *the return* only would be a recognition, and render it of any effect.   His language is, "If the application under which defendants claim, be descriptive of the land in question, and the survey made in fact, before the date of the warrant under which plaintiff claims, although not *returned,* the defendant would be entitled to retain the land."   Now if made *in fact* by proper authority, was the only ground on which, without a return, it could have this effect.   And the single consideration of being made *in fact* by *somebody,* would not be sufficient.   This would not seem to me to have been put so distinctly to the jury by the judge, as to enable them to comprehend the difference.   And yet the difference is immense; and in one

1st of April next ensuing. They exchanged possession of the farms in *York* county.

The following provisions, devises and bequests were contained in the will of *Frederick Eichelberger*, dated the 18th of April, 1821, and in the codicils to that will, the first of which was dated on the 21st of April, 1821, and the second on the 12th of April, 1823.

"I give and devise unto my son *Thomas Eichelberger*, and to his heirs and assigns that tenement plantation and tract of land on which my son *William* lived, situate in *Westmanchester* township aforesaid, being about one hundred and sixty or seventy acres, adjoining lands of *David Bailer*, *Casper Loucks*, *Joseph Worley* and others; and I also give unto my said son *Thomas*, his heirs, and assigns, a piece of the tract on which he has lived, twenty-eight acres on the north side of Carlisle Road, which has been marked and divided by consent by my son *Thomas* and my son *William;* but it is now agreed that my son *Thomas* is to give to my son *William* five acres adjoining his strait line up the hill at the upper side, adjoining *Joseph Worley's* land, and for the other ten acres my son *Thomas* is to pay what he may sell the whole land for, to be paid out of the last money which is to be paid to the estate of my son

---

case gives a validity to the survey, *without a return;* in the other the return only, and *receiving it into* the office can be equal to a preceding authority. The counsel would seem to have erred in not putting this distinctly to the judge to say, whether a survey without authority or with. They took it for granted probably that he meant to speak of a survey by *official authority;* and it is probable that he did mean this. But it is not clear from what he said, how the matter was. Shall we reverse, then, because the language of the judge is ambiguous, and it does not clearly appear what was left to the jury, whether the fact of a survey, or that of a re-survey by authority? Of the fact of a survey there would be no question; but of the fact of a *survey by authority* was the only material question which existed, and which we must presume him to have intended to have submitted to the jury. What evidence the jury had of this was very slight; the mere circumstance of which the judge takes notice that *a survey in fact had been made* about the time of the application. However, this is not a motion for a new trial. And it must be an error, manifestly apparent, on which a judgment can be reversed. But there is such a thing as abandoning even *the equity of a survey made by authority*, by not procuring a *return*, and giving publicity to the official act. The commonwealth in such cases might be let in to grant to new purchasers the land, for which an equity had not been followed up, by *occupancy* or other evidence of appropriation. It does not, therefore, absolutely follow that, even supposing a *survey made by authority*, the defendants were, at all events, entitled *to retain the land*. I think the judge erred in not making this a consideration to the jury, or *deciding on it as a question of law, if mere time only was in question in the case*. Unless excused by the war, or other circumstances, I would think the time here sufficient to justify the commonwealth in granting to other purchasers, and taking money for the warrant, ordering a survey, and granting a patent right. If so, the judge erred in laying it down generally that taking the application to be reasonably descriptive, and the jury even to find that the survey was made by authority, before the return, *the defendants would of course be entitled to retain the land*. On this ground, therefore, I am of opinion to reverse the judgment.

Judgment reversed, and *venire facias de nova* awarded.

*William's* children's trustees as directed in my will, and *Thomas* is to pay what lays on *William's* place, as *William* is to pay what lays on *Thomas'* place, that is, on *William's* place, there is five hundred pounds to be paid in yearly payments, of fifty pounds yearly payments, to my executors, for the use of my other heirs, to pay off them, and if my son *William* is found to be justly in debt to my son *Thomas*, he is to have a regular credit for the said."

"Item, as to my son *William Eichelberger*, I give and devise the plantation and lands whereon my son *Thomas* resides, and has resided, situate in *Westmanchester* township aforesaid, bounded by the turnpike road. The land willed to my son *Bernard's* children, and my son *Charles*, and other lands, according as the same has been laid off and surveyed by *George W. Spangler* at my instance, a piece of twenty-eight acres, being excepted out of the same for my son *Thomas*, as before mentioned, on the north side of Carlisle Road; but in this I have made an alteration in the devise, to which will there appear, and that is my will absolute, and my son *Thomas Eichelberger* is to give in the same way, fifty acres of land, of *George Wolf*, deceased's place, near *Hanover*, unto *Thomas Eich elberger*, *Jacob Eichelberger*, Esq. of *York*, and *Jacob Smyser*, (son of *Jacob*,) and to the survivor of them, their heirs and assigns in trust, with as full power as I myself ever had, to be for the use of my said son *William* and his family, and when the time arrives that my gradson, *Augustus Eichelberger*, is or would be of the age of twenty-one years, if my son *William* is previously dead, then I direct said trustees, or the survivors of them, to sell and convey said plantation and other lands in fee as soon as can be done advantageously, and one-third of the price to be secured on interest for the widow; the other two-thirds to be equally divided among the children, as likewise the other third at his widow's decease, to be considered as vested legacies to them; but if my son *William* lives longer than the time when said *Augustus* would have arrived to twenty-one, then such sale and other proceedings are to take place, at his decease, as above said and mentioned, and there are three hundred and fifty pounds to be paid out of said plantation to my executors after my decease in yearly payments of fifty pounds a year and further all the money which my son *William* is charged in my book with interest from the day of settlement, is to be paid in the same way by his trustees, and also received."

"I, *Frederick Eichelberger*, do add this as a codicil to my foregoing will, as the land given in the will to my son *Thomas*, is now sold to *Matthias Smyser*. I do hereby give unto my son *Thomas*, his heirs and assigns, all the proceeds of such sale, and the moneys therefrom in lieu of said land, and he is to pay out to my

estate all moneys which in and by the said will, he is directed to pay to my estate, and in the same manner as stated in the will."

"A codicil to my last will and testament.   I order and direct my executors to give them the power to sell the land that my son *William* got of my son *Thomas,* near *Hanover,* to pay several debts which will appear.   ,One note at the York Bank, for $420, 00, and one note of $75 00, which I am indorsor thereon, and also the money my son *Thomas* has against my son *William,* is to be paid to my son *Thomas.*   That money that is charged by him and paid for him, and has yet to pay, and what is over and above the above mentioned debts, is to be for my son *William's* family's use as my executors may think proper, and also there are several charges against me in my son *Thomas'* book, which is to be allowed him where I have set my hand and name thereto which will appear," &c.

*William Eichelberger,* died in 1823, in the life-time of his father *Frederick,* who died in the same year.   The land de-cribed in the codicil to the will of *Frederick Eichelberger,* as near *Hanover,* is the.one-fourth of the 180 acres before mentioned.  On the 27th of October, 1827, *Thomas Eichelberger* executed a deed to *Charles A. Morris* and *Jacob Smyser,* for the said one-fourth, &c. in trust for the estate of *William Eichelberger,* deceased, (no money being paid by the grantees to the grantors.)   *William Eichelberger,* at the time of his death, was indebted to *Thomas* by judgment in the Court of Common Pleas of *York* county, in the sum of $2800, which is the claim mentioned in the will of *Frederick* to be paid out of the proceeds of the sale of this land.

The defendants below had been before that time appointed ad-ministrators of *William Eichelberger;* and afterwards obtained an order from the Orphans' Court of *Adams* county, to sell the land aforesaid, to pay the debts of *William Eichelberger,* as if he had died seized of the same in fee.   In 1830, they sold the said land, which sale had been confirmed by the Orphans' Court of *Adams* county; and the defendants have received part of the purchase money.

All the devisees and legatees in the will of *Frederick Eichel-berger,* accepted under the same.

*William Eichelberger,* at the time of his death, was indebted to the plaintiff below in the sum of thirteen dollars, for physic; for the recovery of which this amicable action was entered; and the question presented was, whether the plaintiff was entitled to be paid this sum out of the proceeds of the sale of the land in the hands of the defendants, and in preference to *Thomas Eichelber-*

*ger,* who claimed by virtue of the provisions in the will of *Frederick,* to be paid his judgment. The judgment of the District Court being for the plaintiff, error was assigned on that judgment.

*Lewis* for the plaintiff in error,

Contended that the proceeds of the sale of the land, were not assets, to which the creditors of *William Eichelberger* could resort, as if he had died seized of that land, but passed under the will of *Frederick.* The title to the fifty acres did not vest in *William;* but as *Frederick* the father furnished the consideration upon which the title of *Thomas* was to be transferred to *William* he had a right to control the disposition of it. The principle prevailed, that one who took under a will, cannot take against it, but must make an election either to accept the bounty of the testator, and submit to all the provisions of the will, or disclaim it.

*Evans, Gardner* and *Durkee,* for the defendant in error,

Argued that the principles contended for did not apply to the case. *Frederick Eichelberger,* had no title to the fifty acres; his title was to the two tracts of which his sons were in possession, and which they exchanged. By that exchange the title to the fifty acres, passed from *Thomas* to *William.* The old man by his will, confirmed the title of the land, which was the consideration of the exchange; and directs the fifty acres to go to *William's* children. They were minors, and incapable of giving consent, or making an election. By the transfer of exchange, an equity was vested in *William,* to which at his death his debts attached. The legal estate only was subject to the control of the father, who confirmed the transfer. The consideration for the transfer of the fifty acres, might have failed by the refusal of the father to recognize it, but as it did not fail, the title was perfected and related back to the transfer. Nor could the equity which was vested in *William,* be defeated by the subsequent will of his father, so as to cut out the lien of his creditors which attached at his death, and before that will.

*Lewis* in reply,

Denied that any title to the fifty acres was in *William* at his death. The effect of the exchange upon the title, depended upon the transfer of the title to the land by the father which was the consideration of it, and although he did vest the title in *Thomas,* it was coupled with a disposition of this land, which controled it, and prevented the creditors of *William* from acquiring any right to resort to it as a fund for the payment of their debts.

(Eichelberger's adm'rs. *v.* Jameson.)

The opinion of the court was delivered by

GIBSON, C. J.—By an agreement under seal, two brothers, *Thomas* and *William*, exchange possession of farms, which it is supposed their father intends to give them respectively by his will, *Thomas* throwing in a part of his own land, which, though an undivided interest, I shall call fifty acres. In accordance with this disposition of the brothers themselves, the father makes his will, leaving to each immediately, or through the intervention of trustees, the farm he had intended for the other, and desiring *Thomas* to make assurance of the fifty acres pursuant to the agreement. After this, *William* dies living the father, who, by codicil, directs his executors to sell the fifty acres, and with the proceeds, pay certain notes indorsed by the father, and discounted by *William* at the York Bank, as well as a debt due from the estate of *William* to *Thomas;* and apply the residue to the trusts in favor of *William's* children. The father dead, *Thomas* conveys the fifty acres to the trustees of *William's* children; and the administrators of *William*, who were the defendants below, having procured it to be sold under an order of the Orphans' Court, resist the claim of the plaintiff, as one of his general creditors: so that the question is, whether *William* had such an incipient estate in the fifty acres as may be subjected to satisfaction of his debts; and it requires but a moment's consideration to determine that he had not. The exchange operated in the life-time of the father, if at all, alike on all the lands embraced by it—as well on the fifty acres, as on the parts expected to be ultimately acquired from the father—and consequently only on the possession, as all beyond that, depended on the expected confirmation of the father, without which the subject matter was one, over which the parties could have no control. Had not the father testified his assent to the exchange by giving the two farms in conformity to it, the whole would have remained inoperative, even had *William* survived him; and *Thomas* might, in that event, have regained the fifty acres, of which he could not be deprived without having received the stipulated consideration. The act of the father then, which was necessary to assure this consideration to *Thomas*, came too late to vest a title to the fifty acres in *William*, in his life-time. The entire consideration and estate having to move from the father to *William*, it is impossible to separate the fifty acres from the other lands included in the devise to him; and as that became lapsed by his death, no interest in any part of the lands, the whole being an expected gratuity, ever vested in him. The fallacy with which the mind perplexes itself, is, in supposing that there is an inchoate interest in the parties, binding them in the mean time, and wanting nothing but the confirma-

tion of the father, supposed to have since been obtained, to make it, by relation, complete and indefeasible; which according to *Cark-huff* v: *Anderson*, 3 *Bin.* 4, may be subjected to the demands of creditors. But there could be no inchoate interest in the lands still owned by the father, nor was the exchange obligatory as respects these, because the parties had not the color of an estate to be bound by it in the life-time of the father, further than regarded the immediate occupancy. If then the agreement was inoperative in the life-time of *William,* as regards the lands to be acquired from the father, how can it have been less so as regards the fifty acres, the vesting of which, by the exchange, depended on the vesting of the consideration by the will? But the exchange was in fact not ratified in all respects, the father's testamentary disposition not being altogether in accordance with it. It was certainly ratified so far as regards the lands expected to be acquired from him, but on condition that the fifty acres should be sold by his own executors, instead of going to the heirs of *William*, as an inheritance vested in him in his life-time. His right thus to dispose of it, is not to be questioned, as *Thomas* and the children of *William* have each taken a benefit under the will; and so far as regards *William's* creditors, he was at liberty to assent to the exchange on his own terms, or not at all. *William* had given no consideration for an equity, and the legal estate had not been conveyed to him.

The conveyance to the trustees vested the estate in his children paramount to any supposed interest in *William* himself; and the will, having disposed of it in a way which neither the children nor the creditors of *William* have a right to question, it follows that there was no estate in *William* to answer his debts. Whether the parties really interested will confirm the sale by accepting the purchase money under it, instead of insisting on a sale by the executors, is for them to determine: our business is to decide between the parties on the record, between whom it is clear, there cannot be a recovery.

Judgment of the court below reversed, and judgment here for the defendants below.